# EZRA L. SPANGLER

## *v.*

# WILLIS DANFORTH *et al.*

1. STATUTE OF FRAUDS—*what is a sufficient memorandum in writing.* Where the owner of land, after bargaining for the sale of the same, made and delivered to the purchaser a letter to his agent, residing in the neighborhood of the land, as follows: "Chicago, April 5, 1871. E. T. Chase: Mr. Spangler called on me to-day, and agreed to take the pasture lot for $2400—$1000 cash ($300 down and $700 May 10, 1871); $400 December 1, 1871, at ten per cent; $1000 July 1, 1872, at ten per cent, secured by mortgage. Make the papers, and I will pay you commissions. W. Danforth:" *Held,* that this was such a memorandum, in writing, of the contract of sale as is required by the statute of frauds, and which, if fairly made, in the absence of any other claim intervening, would be enforced in a court of equity.

2. SPECIFIC PERFORMANCE—*as against a prior purchaser under a verbal contract, the second purchaser having a superior equity.* A, the owner of land, had authorized his agent to sell the same for a sum not less than $2400, and on the 5th of April, at 3 o'clock p. m., sold the same to B, and gave B a memorandum, in writing, of the sale, directed to his agent, and requesting the latter to make out the papers necessary to carry into effect the sale. It appeared that on the same day, at 11 o'clock p. m., the agent had verbally sold the same premises to C for $2350, who paid no money at the time. B, at the time of his purchase, paid $20, to bind the bargain, and, on his return, presented his contract to the agent, and requested him to make out the necessary papers, which the latter refused to do, and also made a tender of the balance then due under the contract. On the next day the agent informed C of B's purchase, and B then paid $25 on his purchase, taking a receipt therefor, dated as of the 4th of the same month. The owner, afterwards, upon the representation of his agent that C had paid the $25 at the time of his purchase, conveyed the premises to C. B having tendered the several payments then due and offered to perform the contract, filed his bill against the owner and C for the specific performance of his contract: *Held,* that B had the superior equity, and was entitled to the relief sought, upon bringing the balance of the purchase money, with interest, into court; and that C's verbal contract, without the payment of any money until after notice of B's purchase, was void under the statute of frauds, and not enforcible as against the superior equity of B.

APPEAL from the Circuit Court of Will county; the Hon. JOSIAH McROBERTS, Judge, presiding.

Messrs. BRECKENRIDGE & GARNSEY, for the appellant.

Mr. F. GOODSPEED, for the appellees.

Mr. JUSTICE BREESE delivered the opinion of the Court:

Willis Danforth, residing at Chicago, was, on the fifth of April, 1871, the owner of a tract of land in the city of Joliet, in Will county, known and described as "the pasture lot," containing about twenty acres. In February preceding, he had given to E. T. Chase, a resident of that city, verbal authority to make sale of this lot, at a sum not less than twenty-four hundred dollars. Ezra L. Spangler, the appellant, was also a resident of Joliet, and before the fifth of April, 1871, had a conversation with Chase about the purchase of this lot, but no purchase was effected. On the fifth of April, of that year, Spangler went to Chicago, and had an interview with Danforth, in his office, and received from him a paper of the following tenor:

"CHICAGO, April 5, 1871.

"E. T. CHASE:

"Mr. Spangler called on me to-day, and agreed to take the pasture lot for $2400—$1000 cash ($300 down, $700 May 10, '71); $400 Dec. 1, '71, at 10 per cent; $1000 July 1, '72, at 10 per cent, secured by mortgage. Make the papers, and I will pay you commissions.                W. DANFORTH.

"Rec'd twenty dollars on the above contract.

"W. DANFORTH."

Spangler returned to Joliet with this paper, presented it to Chase and requested him to make out the necessary papers, and tendered to him two hundred and eighty dollars, the balance of the first payment, and, on the 10th of May following, offered to Chase the further sum of seven hundred dollars, and at the

same time offered to execute and deliver a mortgage, according to the agreement with Danforth, and desired him to perform the agreement on his part, by making a deed for the premises, all which Chase refused.

The grounds for Chase's refusal were the following, as Chase and Strong testify : They say that at eleven o'clock in the morning of the same fifth day of April, he, Chase, agreed to sell the ·same land to Strong, and concluded a sale with him, on that day and hour, for twenty-three hundred and fifty dollars. No money was paid by Strong at this time, nor was there any memorandum of the contract made and signed by the party to be charged, or by his agent. On this day, however, Chase prepared a deed from Danforth to Strong, and sent it by the mail of that day to Danforth, at Chicago, it reaching him there on the morning of the sixth. On the sixth, at Joliet, Chase having told Strong that Spangler had been to Chicago and bargained for the land with Danforth, Strong paid Chase twenty-five dollars on the bargain, for which Chase gave a receipt, dating it as of the fourth. This was all the writing between Chase and Strong. Strong paid no money on the fifth, and paid the twenty-five dollars on the sixth, on being informed by Chase that Spangler had been to Chicago, and had seen Danforth, and got the writing herein-before set out. Strong paid no more until the twelfth of April, when the deed was executed to him by Danforth. The price he paid for the land was twenty-three hundred and fifty dollars.

Chase represented to Danforth, so Danforth testifies, that Strong paid him the twenty-five dollars on the fifth day of April; and we infer this fact had much to do in influencing Danforth to the execution of the deed to Strong. There is no wrong imputable to Danforth, for it is clear he endeavored to adjust the equities between these parties as fairly as he could in the light of the supposed facts before him. The important facts were, the agreement by Strong to purchase made at 11 o'clock in the morning of the fifth, some hours before

Spangler purchased, and the payment of twenty-five dollars on that day, by Strong to Chase, on the contract. This seemed to give to Strong a prior equity, and on them Danforth incurring thereby a loss to himself of fifty dollars, he having sold to Spangler for twenty-four hundred dollars, whilst Strong purchased from Chase for twenty-three hundred and fifty dollars, so no expectation of profit can be charged upon Danforth for his action; it was conscientious, undoubtedly.

It appears Spangler had an interview with Chase, prior to the fifth of April, about this land, but came to no terms.

Strong had notice, before he paid any money, that Spangler had a contract for the land from Danforth. In fact, he paid no money until after Chase had informed him Spangler had this contract. He then paid twenty-five dollars. On the 12th of April, Danforth executed a deed to Strong.

It is alleged by Spangler, after he got this contract he took possession of the land on the 8th of April. The truth is, the land was under lease to one Bannon, who was in actual possession, and such possession as Spangler took was a clear trespass on Bannon's right, and he can claim nothing on this score.

The first question naturally arising is, which of these parties, Strong or Spangler, has the prior equity? And this includes the question, which party made the first valid and binding contract? This must be resolved in favor of appellant. The contract he made with Danforth, the owner of the property, about three o'clock in the afternoon of the 5th of April, was such a memorandum, in writing, as required by the statute of frauds and perjuries, fairly made, and would, no other claim intervening, be enforced in a court of equity against the vendor *nolens volens;* whilst the contract made at eleven o'clock of the same day, by Strong, has none of the requisites of the statute, and amounts to no more than a proposal to purchase, and liable to be withdrawn at any moment, it having, of itself, no intrinsic or binding force. It is argued

156            SPANGLER *v.* DANFORTH *et al.*            [Sept. T.,

Opinion of the Court.

by defendant in error the contract could be enforced, provided the vendor did not interpose the statute. That may be so, but the question is, could he affirm such a contract, to the detriment of his own vendee, to whom he had executed a binding contract and taken from him earnest money? Should he have declined to carry out the verbal contract made by Chase, would a court of equity compel him to perform it? No considerable part of the purchase money has been paid. It is said Strong deposited it in bank, but it was to his own credit, for there is nothing in the record to show otherwise.

But, in another view, is the equity of Strong as clear as that of appellant? Does it not seem as if there was some complicity between him and Chase to deprive appellant of the benefit of his contract? The fact is undeniable that, on the 5th of April, Strong had not paid one dollar on the purchase, and when told, on the 6th, that appellant had this contract from Danforth executed on the 5th, he then paid twenty-five dollars, and took from Chase a receipt therefor as having been paid on the 4th, one day in advance of appellant. Why was this done but to give to Strong, so far as priority of payment evidenced by receipt could do it, the prior right? It has the appearance of an arrangement between Chase and Strong to deprive appellant of the benefit of this contract, Chase, perhaps, being displeased because appellant treated with the owner of the property rather than with himself.

We think, in view of all the circumstances, appellant's equity is superior to that of Strong, and Danforth should have conveyed the land to him. He accepted twenty dollars of appellant for the express purpose of binding the bargain, and he retains the money, though it appears he offered to return it to appellant, who refused to accept it.

It is just and equitable, in the view we have felt compelled to take of this case, that appellant should have a legal title, upon payment by him of the price he agreed to pay Danforth, and Strong, having full notice of appellant's equity, should surrender the legal title to him.

The decree is reversed and the cause remanded, with instruction to the circuit court to require appellant to bring into court the balance of the purchase money and interest, in such reasonable time as the court may appoint, to be paid to the parties entitled, after adjusting subsequent equities which may exist between them, in such manner as the facts may warrant.

*Decree reversed.*